IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHARLES F.,* | ) |
| *Claimant-Appellant,* | ) No. 18 C 618 |
| v. | ) Judge Virginia M. Kendall |
| ANDREW M. SAUL, Commissioner of Social Security,† | ) |
| *Respondent-Appellee.* | ) |

## MEMORANDUM OPINION AND ORDER

Claimant-Appellant Charles F. seeks judicial review of an Administrative Law Judge's (ALJ) denial of his application for disability insurance benefits under the Social Security Act. (Dkt. 10 at 36.) Charles F. argues that the ALJ erred by: (1) applying the incorrect legal standard to evaluate an expert medical opinion, and (2) discrediting Charles F.'s statements without good reasons. The Commissioner disagrees with both claims and moved for summary judgment. (Dkt. 21.) Because the ALJ properly assessed the expert medical opinion and had good reasons to discredit Charles F.'s statements, the Court grants the Commissioner's motion (Dkt. 21) and affirms his decision.

---

* Northern District of Illinois Internal Operating Procedure 22 proscribes listing the full name of the Social Security claimant-appellant in a Memorandum Opinion and Order. The Court will therefore refer to the claimant-appellant by his first name and the first letter of his last name.
† Because Andrew M. Saul became the Commissioner of Social Security on June 17, 2019, he automatically substitutes in for Nancy A. Berryhill as the respondent-appellee. *See* Fed. R. Civ. P. 25(d).

## Background

Charles F. applied for disability benefits with the Social Security Administration on April 24, 2014. (Dkt. 13 at 1.) Physically, his diagnosis includes diabetes mellitus (DM), coronary artery disease (CAD), degenerative disc disease (DDD), and obesity. (Dkt. at 10, 26.) Mentally, Charles F. suffers from major depressive disorder (MDD) and generalized anxiety disorder (GAD). (*Id.*) His impairments and their corresponding treatment cause him pain, lethargy, trouble walking, and difficulty with his thought process. (*Id.* at 53–54.)

## I.   Facts

Charles F. is a 48-year-old man. (*Id.* at 82.) He stands 6' tall and reported his weight at 264 pounds in his disability benefits filings, though his recorded weight has fluctuated between 222 and 245 pounds since then. (*Id.* at 30, 82.) Once divorced, he now lives with his fiancée, their 11-year-old daughter, and his fiancée's 21 and 17-year-old sons. (*Id.* at 51.) Charles F. last worked around 2008 as a "picker" for Thornton Industries where he operated a forklift moving boxes and pallets. (*Id.* at 57.) He left the job after about a month because he could neither "deal with the pain every day in [his] legs" nor "understand the paperwork for shipping." (*Id.*)

Growing up, Charles F. had a difficult life at home and at school. Both of his parents suffered from depression and alcohol abuse.‡ (*Id.* at 469.) He described his home as "violent and chaotic." (*Id.*) Charles F.'s father died in 1992, his brother in

---

‡ Charles F. has two arrests for driving under the influence of alcohol. (*Id.* at 470.) He had trouble with drugs and alcohol in his youth but has been abstinent for over eight years. (*Id.* at 68.)

2008, and his mother in 2010, all from myocardial infarction (heart attacks). (*Id.*) Charles F. attended school through the eighth grade and was in special education classes for all subjects starting in the third grade. (*Id.* at 55, 469.) Due to academic trouble, he repeated both kindergarten and the eighth grade. (*Id.* at 469.) Charles F. exhibited behavioral problems in class with peers and teachers. (*Id.*)

These days, Charles F. has limited ability to care for himself at home. He can prepare simple microwaved meals and clean his dishes, but he cannot stand for extended periods of time. (*Id.* at 54.) He can groom and dress himself, but needs help putting on his socks. (*Id.* at 64–65.) Charles F. can use the bathroom on his own but requires the help of his fiancée to shower. (*Id.* at 64.) His fiancée and children aid with other household chores. (*Id.* at 26.) Charles F.'s condition also limits his recreation. He can toss a football with his children, but then needs to rest. (*Id.*) Charles F. estimates that he can walk for one block before he must take a 15-minute rest. (*Id.* at 29.)

### A. Physical Impairments

Charles F. has suffered from diabetes mellitus (DM) since at least 2011, when he first visited Dr. Vermillion, his treating physician. (*Id.* at 30.) Charles F. checks his blood sugar at most twice a day and testified that it fluctuates between 140 and 200. (*Id.*) The diabetes, combined with leg neuropathy, causes tingling in his extremities, which makes it difficult to walk and grasp objects. (*Id.*) As a result, Charles F. frequently drops things. (*Id.*)

Additionally, Charles F. has coronary heart disease (CAD) and has survived two heart attacks, the most recent in 2015. (*Id.* at 30, 50.) Consequently, Charles F. has a stent in his right coronary artery. (*Id.* at 30.) Surgery after the heart attack revealed a left ventricular ejection fraction and severe inferior and moderate lateral wall hypokinesis. (*Id.*) Accordingly, lifting certain objects causes Charles F. chest pain. (*Id.*)

Charles F. also has physical impairments in his back. He suffers from degenerative disc disease (DDD) related to a herniated disc in his spine. (*Id.*) Specifically, he has multilevel lumbar spondylosis, central disc extrusion, and "moderate to severe" central spinal impingement of the L5 nerve roots. (*Id.*) Charles F. takes pain medication for his back and diabetes-related impairments. (*Id.*) Several years before Charles F.'s first visit with Dr. Vermillion in 2011, Charles F. was prescribed Vicodin for knee pain. (*Id.* at 751.) Charles F. became addicted. (*Id.*) He started taking Suboxone in 2007, developed a physical and psychological dependence, and continued to be prescribed the narcotic by Dr. Vermillion through 2015. (*Id.* at 614.) At his hearing, Charles F. denied that he still takes Suboxone and stated that he takes Methadone instead. (*Id.* at 68.) Charles F.'s obesity aggravates his DM, CAD, and DDD. (*Id.* at 30.) Between 2014 and 2016, his body mass index (BMI) fluctuated between 30 and 33. (*Id.*)

### B. Mental Impairments

At Charles F.'s hearing, the impartial medical expert described Charles F.'s mental impairments as his "primary diagnosis." (*Id.* at 70.) Most of the information

related to Charles F.'s mental impairments comes from a consultative, mental status examination administered by Dr. Langgut on August 29, 2014. (*Id.* at 469.) In the examination, Charles F. described symptoms of "moderately severe depression." (*Id.* at 470.) Namely, Charles F. reported feelings of "hopelessness, lethargy, sleep problems, decreased concentration, daily mood disturbance, decreased appetite, . . . worthlessness, and frequent tearfulness." (*Id.*) He disclosed current suicidal thoughts and admitted to a suicide attempt in 2011 that his children stopped. (*Id.* at 470–71.) Charles F. also described feelings of panic—mitigated by medication—and mild social phobia. (*Id.* at 471.) Dr. Langgut conversely noted that Charles F. was "able to laugh" and exhibited an activity level "within normal limits, with no abnormalities of behavior." (*Id.*) Dr. Langgut diagnosed Charles F. with major depressive disorder (MDD), alcohol abuse (in remission), and social anxiety. (*Id.* at 472.)

At the mental status examination, Dr. Langgut also assessed Charles F.'s cognitive profile. Charles F. exhibited "intact" immediate, short-term, and long-term memory skills. (*Id.* at 471.) Tests administered by Dr. Langgut also revealed Charles F.'s "intact" basic computational skills, though his speed was slow. Further, Charles F. showed "an adequate degree of abstract reasoning," "intact judgment [and insight]," "average coherence," and "normal . . . [mental] flexibility." (*Id.*) Dr. Langgut acknowledged that Charles F. demonstrates "moderately severe ruminative ideation, mild obsessive ideas, and a mild phobia of social settings." (*Id.*)

## II. Procedural History

On April 24, 2014, Charles F. applied for disability benefits under the Social Security Act. (*Id.* at 23.) The Social Security Administration initially denied the application on September 16, 2014, and then again after reconsideration on February 24, 2015. (*Id.*) On March 4, 2015, Charles F. submitted a written request for a hearing before an ALJ. (*Id.*) Charles F., represented by counsel, testified in person at the hearing on June 9, 2016. (*Id.*) An impartial medical expert and impartial vocational expert also testified at the hearing. (*Id.*)

After the hearing, Charles F. had 30 days to submit additional evidence. (*Id.*) The ALJ granted three extensions so that Charles F. and his counsel could complete the record. (*Id.*) Charles F. then submitted "Office Treatment Records" and "Hospital Records" from his middle school, treating doctor, and other doctors and hospitals. (*Id.* at 41.) The ALJ included the additional evidence in the record. (*Id.* at 23.)

The ALJ ruled that Charles F. is not disabled under the Social Security Act. (*Id.*) Therefore, she denied his application for disability benefits. (*Id.*) In her opinion, the ALJ applied the familiar five-step analysis to find that Charles F. was not disabled. (Dkt. 10 at 36.) At step one, the ALJ found that Charles F. had not engaged in substantial gainful activity since his April 2014 application date. (*Id.* at 25.) At step two, the ALJ classified Charles F.'s six impairments, DM, CAD, DDD, obesity, MDD, and GAD, as "severe." (*Id.*) At step three, the ALJ found that the impairments—alone and in concert—did not automatically disable Charles F. under the criteria identified in 20 C.F.R. Part 404, Subpart P. Appendix 1. (*Id.*)

In Charles F.'s case, the ALJ determined that he has the residual functional capacity (RFC) to perform "light work" as defined in 20 C.F.R. 416.967(b):

> . . . occasionally lifting and/or carrying 20 pounds; frequently lifting and/or carrying 10 pounds; standing and/or walking for about six (6) hours in an eight (8) hour workday; and sitting for about two (2) hours in an eight (8) hour workday; except for occasionally climbing ramps and stairs; never climbing ladders, ropes, or scaffolds; occasionally balancing, stooping, kneeling, crouching and crawling; frequently reaching in all directions including overhead with bilateral upper extremities (BUE); and frequently handling, fingering and feeling with BUE. The claimant could tolerate occasional exposure to and/or work around extreme cold and heat, wetness, humidity, vibration, fumes and other pulmonary irritants and hazards such as moving machinery or unprotected heights. He is able to perform simple, routine tasks requiring no more than short simple instructions and simple work related decision making with few work place changes. He is able to maintain no more than occasional contact with the public of a brief, superficial and incidental nature and no more than occasional interaction with supervisors and co-workers; and can work in proximity of others, but with no shared or tandem tasks.

(*Id.* at 28.) To make Charles F.'s RFC finding, the ALJ followed the prescribed two-step process for each of the claimant's symptoms. (*Id.* at 29) First, she determined whether an "underlying medically determinable physical or mental impairment" could be reasonably expected to produce Charles F.'s symptoms. (*Id.*) Second, once the ALJ established the medical connection between the impairment and its symptoms in step one, she evaluated the "intensity, persistence, and limiting effects" of the symptoms to discern the degree to which they hinder Charles F.'s functioning. (*Id.*) The ALJ performed the two-step assessment for each of the six physical and mental impairments alleged.

Charles F. sought review of the denial of his benefits in this Court on July 9, 2018. (Dkt. 13.) The Commissioner moved for summary judgment on October 19, 2018. (Dkt. 21.)

**Standard of Review**

Because the Appeals Council denied review, the Court analyzes the ALJ's ruling as the final word of the Commissioner. *See Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018), *as amended on reh'g* (Apr. 13, 2018). The Court must determine whether substantial evidence supports the ALJ's findings. *See Walker v. Berryhill*, 900 F.3d 479, 482 (7th Cir. 2018). The substantial evidence standard requires "more than a 'mere scintilla' of proof and instead 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). To satisfy the standard, the ALJ must "build an accurate and logical bridge from the evidence to her conclusion." *Spicher v. Berryhill*, 898 F.3d 754, 757 (7th Cir. 2018) (citations omitted).

"When reviewing for substantial evidence, [the Court does] not displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Richardson*, 402 U.S. 389 at 401). If substantial evidence supports the ALJ's findings, the Court will uphold those findings "even if an alternative position is also supported by the substantial evidence." *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004) (citing *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992)). Judicial deference, however, has limits. The Court's examination of the record must ensure the ALJ weighed the evidence

for and against the claimant. *Brinley v. Berryhill*, 732 F. App'x 461, 465 (7th Cir. 2018). Indeed, the ALJ's decision must explain how the evidence supports her conclusion. *Id.* (citing *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015).

## Analysis

Charles F.'s challenge to the Commissioner's decision is twofold. First, he argues the ALJ's RFC determination is unsupported by substantial evidence because the ALJ did not consult Charles F.'s treating physician. Second, he contests the ALJ's adverse credibility determination. The Commissioner contends that Charles F. alone had the burden to produce evidence and the ALJ was not required to contact the treating physician. Further, he asserts that the ALJ reasonably assessed Charles F.'s credibility.

**I.  RFC**

Charles F. asserts that the ALJ relied on a medical record that was factually insufficient to base an RFC determination on. He explains that the ALJ "failed to develop or even assist in developing medical evidence in the record that would provide substantial evidence." (Dkt. 13 at 6.) According to Charles F., the ALJ should have sought out Charles F.'s treating physician, Dr. Vermillion, instead of "rel[ying] upon the non-examining opinions to speculate at [Charles F.'s] RFC." (*Id.* at 6.) Citing 20 C.F.R. § 416.912, he insists the ALJ had a burden to complete the medical evidentiary record with Charles F.'s treating physician's opinion and the ALJ failed to do so.

As a preliminary matter, the Commissioner states that Charles F. waived (really, forfeited) his right to ask the ALJ to include the treating doctor's opinion in the

record because Charles F.'s attorney did not raise the issue at the hearing. In his reply brief, Charles F. claims that he had no opportunity to ask for Dr. Vermillion's opinion at the hearing. But Charles F. *did* have such an opportunity. The ALJ began the hearing by asking Charles F.'s attorney if he had other information to add to the record. Charles F.'s attorney then indicated that he was awaiting other materials that he would submit later, including Dr. Vermillion's files on Charles F.

The ALJ kept the record open so that she could receive Dr. Vermillion's files, among others, which were then entered into the record. Thus, Charles F. had opportunities during and after the hearing to request the opinion of Dr. Vermillion. After the hearing, "[a]n ALJ is not obliged to reopen the record." *Donahue v. Barnhart*, 279 F.3d 441, 447 (7th Cir. 2002) ("Raising a discrepancy only after the hearing, as [claimant's counsel] did, is too late"). Because Charles F.'s attorney failed to object to the absence of Dr. Vermillion's opinion at his hearing, he forfeits the argument on appeal. *See Brown v. Colvin*, 845 F.3d 247, 254 (7th Cir. 2016) (holding that the claimant-appellant forfeited several arguments regarding the testimony of the vocational expert by "failing to object during the hearing").

Even if Charles F. had not forfeited the argument, the evidentiary guidelines in the statute Charles F. cites do not mandate the inclusion of a treating doctor's opinion in the record. 20 C.F.R. § 416.912 breaks down the respective obligations of the claimant and ALJ to adequately produce medical evidence and prepare a medical record. For the claimant's part, § 416.912(a)(1) states that:

> . . . you [claimant] have to prove to us that you are blind or disabled.
> You must inform us about or submit all evidence known to you that

> relates to whether or not you are blind or disabled (*see* § 416.913). This duty is ongoing and requires you to disclose any additional related evidence about which you become aware. This duty applies at each level of the administrative review process . . .

On top of that, § 416.912(a)(2) provides that the "case record must be complete and detailed enough to allow [the ALJ] to make a determination or decision about whether [the claimant is] disabled or blind." For the ALJ's part, § 416.912(b) indicates that the ALJ "will develop [the claimant's] complete medical history for at least the 12 months preceding the month in which [claimant] filed [his] application."

That said, the ALJ's duty to prepare a complete record has natural limits. "Taking 'complete record' literally would be a formula for paralysis" because a claimant can always obtain more examinations and medical opinions. *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) (citing *Kendrick v. Shalala*, 998 F.2d 455, 456 (7th Cir. 1993)). Therefore, the record is complete as a matter of law when it contains adequate information for the ALJ to render a disability decision, regardless of whether the treating doctor has weighed in. *See Skinner v. Astrue*, 478 F.3d 836, 844 (7th Cir. 2007). An ALJ may contact a treating doctor to fill in gaps in the medical record, but not to bolster a weak claim. *See id.*

Here, Charles F. was dutybound to submit all the relevant evidence he needed to support his disability case. The ALJ was obliged to compile the medical information, to the extent that she could, so she could make a disability decision. While the ALJ described the record at the hearing as "lawfully inadequate," she then granted three extensions of time so Charles F.'s attorney could supply Dr. Vermillion's records and those of other doctors and hospitals. At that point, the record

became complete because it contained the information the ALJ needed to enter judgment. She completed the full five-step analysis, including an RFC calculation, and determined that Charles F. is not disabled and can complete "light work." Charles F. does not argue that the record has gaps in it that the treating doctor's opinion would fill. Rather, he contends that the treating doctor's opinion would be "valuable information" to support his claim. Therefore, the burden was on Charles F. to supply an opinion from Dr. Vermillion.

Charles F. further argues in his reply brief that the claimant's duty to produce evidence does not comport with "reality," seeing that claimants often lack the knowledge and resources to submit relevant medical evidence. Charles F.'s attorney, however, is such a resource. Indeed, he did obtain and submit Charles F.'s medical evidence going back to 2011 to complete the record. For that reason, the record was complete with or without Dr. Vermillion's opinion, and the ALJ had a factually adequate record to base her decision on.

## II. Credibility

Charles F. also maintains that the ALJ failed to credit his statements and neglected to explain her reasoning for doing so. First, Charles F. takes issue with the fact that the ALJ did not find medical-record support for Charles F.'s symptoms. Next, Charles F. posits that the ALJ relied on his gaps in psychiatric treatment to determine that his symptoms were less debilitating than alleged.

Because reviewing courts lack the opportunity to observe a claimant's testimony, they afford ALJ credibility findings special deference. *See Castile v. Astrue*,

617 F.3d 923, 929 (7th Cir. 2010) (quoting *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000)); *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010) (noting that a reviewing court will uphold an ALJ's credibility determination unless it is "patently wrong"). Still, the ALJ must have built an "accurate and logical bridge" between the evidence and conclusion. *Id.*

Title 20 of the Code of Federal Regulations outlines how an ALJ evaluates a claimant's symptoms, including pain. According to § 404.1529(a), the ALJ will consider the claimant's statements, but there must be "objective medical evidence" that the claimant's impairments could "reasonably be expected to produce the pain or other symptoms alleged." Within that evaluation, the ALJ will consider the "intensity" and "persistence" of such symptoms as supported by the medical evidence and the claimant's own statements. § 404.1529(a). Relevant factors include the claimant's "daily activities; . . . medication; . . . [and] treatment, other than medication." § 404.1529(c)(3)(i), (iv)–(v).

Charles F. submits that the ALJ improperly called his symptoms "alleged" in furtherance of a "pre-conceived conclusion" that he was capable of "light work." To that end, he contends that the ALJ determined Charles F.'s daily activities are "equivalent to a light work RFC" even though the Seventh Circuit has held that such activities do not "necessarily translate into an ability to work full-time." *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013).

Section 404.1529(c)(3)(i), however, states that "daily activities" are a relevant factor in evaluating the credibility of symptoms. The ALJ did not establish that

Charles F.'s daily activities—namely his ability to prepare simple meals, read, do simple math, engage with his children, and dress and groom himself—translate to light work. Rather, she followed the correct procedure to determine that the daily activities are "consistent with a light level of exertion."

Furthermore, Charles F. asserts that the ALJ should have considered whether the medical record "disproved" his need for a cane and his history of falls. But it is the ALJ's role to decide whether there are "inconsistencies in the evidence" between claimant statements and the medical record. 20 C.F.R. § 404.1529(c)(4) (stating that symptoms that establish a claimant's diminished work capacity should be "consistent with the objective medical record"). Here, the ALJ simply concluded that Charles F.'s difficulty ambulating is not consistent with the objective evidence in his medical record. The ALJ noted that the medical record mentioned a cane only in that Charles F. was observed using one in a single instance during his consultative examination in 2014.

That is what makes this case different than *Thomas v. Colvin*, where the Seventh Circuit remanded the ALJ's disability denial for failure to recognize the claimant's need for a cane. 534 F. App'x. 546, 550 (7th Cir. 2013). There, the ALJ mentioned the claimant's cane only once in reference to a doctor's observation that the claimant "ambulates with a cane." *Id.* The ALJ did not question the claimant on the cane and ignored the (1) prescription for said cane, (2) questionnaires referencing the cane, and (3) several doctors' notes about the cane. *Id.* The Court of Appeals held that the ALJ erred because she "failed to consider the issue at all, leaving [the Court]

without a finding to review." *Id.* Here, the ALJ considered all available evidence about the cane and questioned Charles F. extensively about his use of the cane. In her conclusion, she considered the claimant's testimony, its inconsistency with the medical record, and made her decision as supported by "objective clinical findings." The Court accepts those findings.

The ALJ additionally cited the gaps in Charles F.'s psychiatric treatment history as evidence that his symptoms are "not as debilitating as alleged." (Dkt. 10 at 32.) Generally, in building the logical bridge between evidence and conclusion, an ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek . . . regular medical treatment without first considering any explanations that the individual may provide." *Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013) (citations omitted). In *Roddy*, for instance, the ALJ incorrectly "rested his credibility determination" on the claimant's failure to seek treatment. *Id.*

Here, however, Charles F.'s two-year gap in psychiatric treatment was "another indication" that weighed against the credibility of his testimony, not the primary or sole factor on which the ALJ rested her determination. (Dkt. 10 at 28.) The ALJ included the treatment gap in a list of other medical evidence substantiated by the record. Psychiatric examinations described the symptoms of Charles F.'s mental impairments as "mild" and "moderately severe." (*Id.* at 29.) In fact, they recorded his affect as "appropriate." *Id.* Elsewhere in her decision, the ALJ represented Charles F. as "cooperative and polite" at the hearing. (*Id.* at 27.) To be sure, the ALJ

should not have made an inference based on Charles F.'s treatment gaps. Even so, her decision is not "patently wrong." Based on the quantum of evidence in the record and the special deference owed to ALJ credibility determinations, the ALJ properly built an accurate and logical bridge between Charles F.'s symptoms and her conclusion. The Court approves her credibility determination.

## Conclusion

All in all, substantial evidence supports the ALJ's conclusions. For the reasons stated above, the Court grants the Commissioner's motion for summary judgment (Dkt. 21) and affirms his decision denying Charles F. disability benefits under the Social Security Act.

_____
Virginia M. Kendall
United States District Judge

Date: August 12, 2019